## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **1:25-CR-00111-APM** |
| **DON CHASE,** <br>                    **Defendant.** | |

### GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this opposition to the defendant Don Chase's ("Chase") Motion to Suppress, filed at ECF No. 7 ("Def. Mot."). Chase, through counsel, moves this Court to suppress a firearm, 529 Oxycodone pills, and $11,621.96 seized from Chase near the time of his arrest. *See generally* Def. Mot., ECF 7. In support of his argument, Chase claims that officers lacked reasonable articulable suspicion to seize him, and that he was not lawfully arrested when officers searched incident to arrest the crossbody satchel on his person, discovering a large quantity of illegal narcotics and cash.

Chase's motion fails. First, officers had reasonable, articulable suspicion to conduct an investigatory stop of Chase when they observed him walking through a high-crime area late at night, holding an unknown beverage in an open cup, wearing a crossbody satchel, and acting suspiciously after noticing officers. Their reasonable suspicion was further supported when Chase took unprovoked flight as officers approached the sidewalk. As Chase fled from law enforcement, an illegal firearm fell from his person, providing probable cause to arrest him.

Second, because Chase was lawfully arrested for illegal possession of a firearm, his challenge on the search incident to arrest of his satchel is also baseless. The unzipped satchel was

1

located on his person at the time of arrest and officers reasonably feared that Chase had another firearm or could access the open satchel and destroy evidence. Thus, the search of the open satchel was also a valid search incident to arrest. Further, even if the search of the satchel was not appropriate at the time of Chase's arrest, the contents of the satchel are still admissible under the doctrine of inevitable discovery. MPD Policy requires officers to inventory *all* property upon arrest, meaning the contents of the open satchel are subject to inevitable discovery.

In support of this opposition, the United States relies on the points and authorities set forth below, and any additional points and authorities which may be cited at a hearing on this motion.

## FACTUAL BACKGROUND

On July 24, 2024, Metropolitan Police Department (MPD) Third District Crime Suppression Officers Winston Whitfield, Chase Williams, and Pablo Rosa were in full uniform operating a marked MPD cruiser.[1] Officers were performing routine patrols through the U Street Corridor of Northwest Washington DC when they came upon Chase, walking with several others on the 1900 block of 9th Street NW, which is considered a high-crime area and an area very close to bars and clubs on the U Street corridor. Chase was wearing an open satchel strapped across his body and holding in his left hand an unknown beverage.

As Officers Williams and Whitfield exited their vehicle to approach Chase and inquire about the beverage and satchel, they noticed Chase separate from most of the group and change his walking direction from northbound on the 1900 block of 9th Street to southbound on the 1900

---

[1] Each of the Officers was wearing a body-worn camera ("BWC"), worn approximately above the sternum. When activated, a BWC begins recording sound and video, and captures approximately two minutes of video (without audio) prior to activation. As recorded in this matter, the BWC footage for each Officer has an internal time stamp in the upper right-hand corner of the image. For consistency reference to BWC hours throughout this brief will refer to the time-stamp on the recording itself.

block of 9th Street toward the 1800 block of 9th Street, blading the right side of his body and the satchel away from the Officers.[2] Notably, Chase made this directional change once the Officers would have been visible to him but before Officers said anything.  Officers also observed that Chase became visibly nervous to include darting his eyes back in their direction and sped up his initial slow-packed walk as officers continued to approach the sidewalk. *See* Govt. Ex. 1 (Whitfield BWC) at 00:10:04-00:10:13.

As Officers Williams and Whitfield approached, Officer Whitfield asked those on the sidewalk if "y'all [are] headed up 9th street."  *See* Govt. Ex. 1 (Whitfield BWC) at 00:10:09. Neither Officer Whitfield nor Officer Williams asked or commanded Chase to stop; to the contrary, in a non-aggressive tone Officer Whitfield said "yeah, yeah you good, man" as he walked toward the sidewalk.  *Id.* at 00:10:12.



*Still photo from Govt. Ex. 1 (Whitfield BWC) at 00:10:12, showing*
*Chase holding a beverage moments before he fled*

[2] CCTV footage also documents Chase's sudden change in direction.  *See* Govt. Ex. 7 (Excerpt of CCTV of 9th St.) at 00:32 seconds (Chase, wearing the crossbody satchel, is visible on video), 00:52 seconds (Officers exit the vehicle and begin to approach the sidewalk, and Chase separates from the group and changes direction), and approximately 00:57 seconds (Chase breaks into unprovoked flight).

Chase did not respond and instead abruptly fled and sprinted southbound, off the sidewalk and into the street, while he appeared to be grabbing toward his waistband area. Officers Whitfield and Officer Williams initiated a foot pursuit, with Officer Rosa following in the cruiser. Chase discarded of the unknown beverage during this foot pursuit.



*Still photo taken from CCTV Footage of Intersection, Govt. Ex. 6 (Excerpt of CCTV Intersection), showing initial foot pursuit. The red circle indicates Chase, blue is Ofc. Williams, and yellow is Ofc. Whitfield*

The ground was slick from recent rain, and as Chase attempted to elude the officers, he slipped and fell at approximately 00:10:18 to 00:10:19 am. *See* Govt. Exs. 1 (Whitfield BWC) & 2 (Williams BWC) at 00:10:18. He then stood up and attempted to continue fleeing. Officer Williams, who had caught up to Chase, grabbed toward him. *See* Govt. Exs. 1 (Whitfield BWC) & 2 (Williams BWC) at 00:10:19-20. However, Officer Williams is not sure—and the BWC and CCTV footage are unclear—as to whether Officer Williams made contact with Chase at approximately 00:10:19 am and Chase then slipped away, or if officers first made physical contact

with Chase seconds later in the encounter.  Govt. Exs. 1 (Whitfield BWC) & 2 (Williams BWC) at 00:10:19-20.

As Chase continued to evade Officers Williams and Whitfield, Officer Rosa observed a black "L" shaped object fall from Chase. Officer Williams heard a heavy metallic object consistent with a firearm hit the ground as Chase continued to elude his grasp. The BWC footage from Officers Whitfield and Williams show the gun falling from Chase's person at approximately 00:10:20 am.  *See* Govt. Exs. 1 (Whitfield BWC) & 2 (Williams BWC) at 00:10:20-21.



***Photo taken from Govt. Ex. 1, Officer Whitfield's BWC from July 24, 2024, showing firearm falling to the ground from Chase's person.***



*Photo taken from Govt. Ex. 2, Officer Williams' BWC from July 24, 2024,*
*showing firearm falling to the ground from Chase's person.*



*Photo taken from Govt. Ex. 1, Officer Whitfield's BWC from July 24, 2024,*
*showing firearm falling to the ground from Chase's person.*

Officer Whitfield briefly grabbed the strap to Chase's satchel at 00:10:21 am, and Chase

again slipped and fell, at which time Officers Whitfield and Williams definitively made contact

with Chase. *See* Govt. Exs. 1 (Whitfield BWC) & 2 (Williams BWC) at 00:10:21-23.  Meanwhile,

as Officers Williams and Whitfield grappled with Chase, Officer Rosa exited the police cruiser and retrieved the firearm.  *See* Govt. Ex. 3 (Rosa BWC) at 00:10:18-00:10:40.



***Photo taken from Govt. Ex. 3, Office Rosa's BWC from July 24, 2024,
showing recovery of firearm.***

At approximately 00:10:45, Officer Whitfield completed a tactical takedown that brought Chase to the ground.  Govt. Ex. 3 (Rosa BWC) at 00:10:45-50.[3]  Shortly thereafter, Officer Rosa radioed in the firearm recovery and requested transport.  *Id.* at 00:11:13-23.  Other Third District Crime Suppression Officers to include Officers Wilson, Rider, Dawes, Kurland, and Selgas arrived on scene to assist placing Chase in handcuffs.

As officers attempted to handcuff Chase, Chase continued to resist arrest and on multiple occasions grabbed toward his unzipped crossbody satchel, leading officers to fear that he may have another firearm on his person.  Several comments to this effect are documented on body-worn camera, including:

- 00:11:47 am:
  - "He's still reaching"
  - "He might have another [gun]"
- 00:11:51 am:

---

[3] Officer Whitfield's BWC was briefly knocked to the ground during this encounter. This portion of Chase's arrest is captured on other officers' BWC.

- o "Stop reaching for shit"
- 00:11:53 am:
  - o "Stop fucking reaching, bro"
- 00:12:16 am:
  - o "His bag, his bag, he was reaching for his bag"
  - o "He might have something else, bro"

*See, e.g.* Govt. Ex. 2 (Williams BWC).

At 00:12:20 am, Officer Whitfield patted the exterior of the satchel and looked into the open crossbody bag. Govt. Ex. 1 (Whitfield BWC), 2 (Williams BWC), & 4 (Kurland BWC) at 00:12:20. Chase was subsequently handcuffed and placed under arrest.

Officers led the now-handcuffed Chase to lean against the police cruiser to get his information and to assess whether Chase had been injured during his attempts to resist police or in the ensuing takedown. As Chase leaned against the vehicle, Officers Kurland and Williams discussed how to remove the unzipped satchel from Chase's person and determined that they could not do so while Chase was handcuffed. *See* Govt. Ex. 4 (Kurland BWC) at 00:14:00-00:14:32.

After Chase repeatedly refused to provide his name to officers, *id.* at 00:15:19 and Govt. Ex. 2 (Williams BWC) at 00:14:28-00:15:19, 00:16:40-00:16:54, Officer Williams reached into the satchel to check for identification, and in doing so removed what appears to be a pill bottle. *See* Govt. Ex. 5 (Selgas BWC) at 00:16:54-00:17:05. Chase then provided his name, *id.* at 00:17:02-00:17:36, and Officer Selgas returned to a police cruiser to run it through law enforcement databases. Govt. Ex. 5 (Selgas BWC) at 00:17:21-00:18:55. Officers subsequently determined that Chase had two active fugitive warrants: an extraditable warrant for failure to appear in a carjacking and assault case out of Prince George's County, Maryland, and a second extraditable warrant for armed robbery and assault out of Annapolis, Maryland.

Officers' efforts to complete the search incident to arrest of Chase, including their efforts to remove and more thoroughly search the crossbody satchel, were repeatedly paused as Chase

vomited what appeared to be a large amount of liquid. E.g., Govt. Ex. 2 (Williams BWC) at 00:17:39, 00:18:08, 0018:27, 00:19:06; *see also* Govt. Ex. 4 (Kurland BWC) at 00:20:43-59 (discussing the need to take off the bag but wanting to "make sure" Chase "got everything out of [his] system first."). At approximately 00:17:50, Officer Kurland began searching Chase's pockets. Officer Kurland placed the contents of Chase's pockets into the crossbody satchel for later inventory.  At Chase's request, Officers also removed Chase's watch and placed it into the bag. Govt. Ex. 4 (Kurland BWC) at 00:19:14-00:19:46.    Throughout his interactions with Officers, Chase slurred his words and appeared to be intoxicated.

At approximately 00:21:00, Officers Kurland, Wilson, and Williams walked Chase over to waiting transport cruiser. *See* Govt. Ex. 4 (Kuland BWC) at 00:21:22. Officers began preparing Chase for transport, such as removing and searching his shoes. *Id.*  at 00:22:00; *see* Govt. Ex. 8, GO 502.01 at 6-7. Officers again discussed the need to do a "thorough search" prior to transport, and temporarily removed Chase's handcuffs so that they could take off the satchel.  *See* Govt. Ex. 4 (Kurland BWC) at 00:22:40-00:24:16. Officers then cleared Chase for transport. *Id.* at 00:25:22.

Chase complained of pain in his right arm and hip and was taken to Howard University Hospital.  After evaluation, he was taken to the Third District station for continued processing.

Consistent with MPD policy, officers inventoried Chase's property once back at the station. The inventory determined that Chase was in possession of 529 tablets of various kinds of Oxycodone and $11,621.96 in United States Currency.



***Drugs and Currency Recovered from Chase***

The firearm recovered was determined to be a HS Produkt (imported by Springfield Armory) model: XDM, 9mm caliber pistol, bearing serial number MG794038. The magazine inserted into the firearm had a capacity of 17 rounds and was loaded with 15 rounds of 9mm ammunition with 1 round in the chamber, totaling 16 rounds of 9mm ammunition.



***Photos of Black HS Produkt (imported by Springfield Armory) XDM Firearm,
Serial Number MG794038, Magazine, and Ammunition Recovered from Chase***

10

A WALES/NCIC inquiry conducted on the serial number affixed to the firearm revealed that it was stolen out of Atlanta, Georgia. A records query established that Chase did not have a license to carry a firearm in the District of Columbia.

On April 17, 2025, a federal grand jury returned a three-count indictment charging Chase with unlawful possession of a firearm and ammunition by a person previously convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. § 922(g)(1) (Count One); unlawful possession with intent to distribute oxycodone, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (Count Two); and using, carrying and possessing a firearm during a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1) (Count Three). ECF 1.

## LEGAL STANDARD

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons…against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. Const. amend IV. A Fourth Amendment seizure occurs only "when physical force is used to restrain movement or when a person submits to an officer's 'show of authority.'" *United States v. Brodie*, 742 F.3d 1058, 1061 (D.C. Cir. 2014) (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991)). The Fourth Amendment requires that "all seizures, even ones involving 'only a brief detention short of traditional arrest,' be founded upon reasonable, objective justification." *United States v. Gross*, 784 F.3d 784, 786 (D.C. Cir. 2015) (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975)).

Whether a seizure is reasonable depends on the type of seizure at issue. While officers need probable cause to make a warrantless arrest, *see Maryland v. Pringle*, 520 U.S. 366, 370 (2003), they are permitted under *Terry v. Ohio*, 392 U.S. 1, 30 (1968), to "briefly detain a citizen' when they 'ha[ve] a reasonable, articulable suspicion that criminal activity may be afoot,'" *United States v. Delaney*, 955 F.3d 1077, 1081 (D.C. Cir. 2020) (quoting *United States v. Edmonds*, 240

F.3d 55, 59 (D.C. Cir. 2001)). "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 528 U.S. 119, 1923 (2000). For both probable cause and reasonable suspicion, courts look to the totality of the circumstances. *See United States v. Holder*, 990 F.2d 1327, 1328 (D.C. Cir. 1993) ("Probable cause exists if a reasonable and prudent police officer would conclude from the totality of the circumstances that a crime has been or is being committed.") *and Edmonds*, 240 F.3d at 59 ("An officer on the beat does not encounter discrete, hermetically sealed facts. Rather, as we repeatedly have cautioned, the question of whether reasonable suspicion existed can only be answered by considering the totality of the circumstances as the officer on the scene experienced them.").

Once law enforcement has probable cause that an individual has committed a criminal offense, they may conduct a search incident to arrest. *See Rawlings v. Kentucky*, 448 U.S. 98, 110-11 (1980); *United States v. Powell*, 483 F.3d 836, 837 (D.C. Cir. 2007) (en banc). This includes a full search of a defendant's person and personal items in his possession and control. *Chimel v. California*, 305 I/S/ 752, 763 (1969). There are two purposes of a search incident to an arrest: to remove any weapons, and to prevent destruction of evidence. *United States v. Gant*, 556 U.S 332, 339 (2009).

## **ARGUMENT**

Chase's motion alludes to numerous legal theories, all of which are meritless. As set out below, officers had reasonable suspicion to stop and seize Chase at all stages of the encounter. And after a firearm *fell from Chase's person* and into plain view as Chase was attempting to flee from police, Officers clearly had probable cause to arrest Chase, and then search incident to arrest

the already-unzipped crossbody satchel on his person.  Thus, the seizure of the firearm, currency, and Oxycodone were legal.

For Chase's motion to suppress the firearm to succeed, the Court must find that when Chase was first seized by law enforcement, Officers had neither reasonable articulable suspicion nor probable cause justifying a *Terry* stop, such that the seizure ran afoul of the Fourth Amendment. Here, Chase does not explain when he contends that he was first "seized" by law enforcement, baldly asserting only that it was "at the point that the police officers stopped him."  ECF 7 at 2. The question for the Court is accordingly *when* "police officers stopped [Chase]" and *what justification* officers had at that moment.

The encounter between Chase and MPD has three critical phases: first, the initial interaction when Officers approached the sidewalk; second, Chase's unprovoked flight from police; third, the seconds in which the firearm fell from Chase and Officers first made physical contact.  When analyzed, it is clear that Chase was not "seized" until the last stage and that, in any case, Officers had at minimum reasonable, articulable suspicion at *every* stage of this encounter. That latter fact alone is fatal to Chase's efforts to suppress the seized firearm.

I.  **Chase Was Not Seized During the Initial Interactions with Officers, and Even if He Had Been Stopped, Officers Had Reasonable Suspicion To Do So**

a.  *Chase was not seized during his initial interactions with officers*

Not all interactions between officers and citizens are a *Terry* stop.  Rather, "[a] seizure that would implicate the Fourth Amendment and *Terry* takes place when a police officer physically overpowers an individual or when the individual submits to a show of authority by law enforcement."  *United States v. Bridges*, 382 F. Supp. 3d 62, 68 (D.D.C. 2019).  A "seizure occurs whenever a police officer makes 'physical contact' with a suspect 'with intent to restrain,' regardless of whether the suspect stops or otherwise submits in response to the contact."  *United*

*States v. Williams*, 2024 WL 4647643, at *10 (D.D.C. Oct. 31, 2024) (quoting *Torres v. Madrid*, 592 U.S. 306, 317 (2021)).  The defendant bears the burden of demonstrating that he was seized. *Castle*, 825 F.3d at 633 (citing *Goddard*, 491 F.3d 457, 462 (D.C. Cir. 2007)).

The BWC from Officers' initial approach of Chase incontestably shows that there was not yet "physical contact" prior to Chase's unprovoked flight.  Indeed, officers were still many feet away from Chase when he sprinted away from them.  Chase is thus left with whether he "submitted" to a "show of authority."

Whether police actions amount to a "show of authority" turns on whether a reasonable person would have believed he was not free to leave.  *Castle*, 825 F.3d at 632.  The D.C. Circuit has enumerated several factors in determining whether Officers' actions amount to a show of authority, including "whether the suspect was physically intimidated or touched, whether the officer displayed a weapon, wore a uniform, or restricted the defendant's movements, the time and place of the encounter, and whether the officer's use of language or tone of voice indicat[ed] that compliance with the officer's requirement might be compelled."  *Castle*, 825 F. 3d at 632 (quoting *United States v. Wood*, 981 F.2d 536, 539 (D.C. Cir. 1992) (internal quotations omitted)).

Under this analysis, the Officers' initial approach does not rise to a "show of authority."  Their actions comprised of walking toward Chase while in uniform, and Officer Whitfield asking in a casual tone where those on the sidewalk were headed and stating, "you good, man."  Chase was not surrounded, boxed in, or otherwise physically intimidated by law enforcement.  He had not received any commands or other indications that compliance was compelled.  *See United States v. Goddard*, 491 F.3d 457, 461 (D.C. Cir. 2007) (stop had not started as "soon" as police drove up, because nothing in the record indicated that officer acted aggressively or impeded the defendant's movement); *United States v. Hagan*, 2024 WL 1340879 (D.C. Cir. Mar. 29, 2024) (unpub.) ("An

approach by a uniformed police officer is not a seizure . . . Nor is it a seizure when an officer 'approaches an individual and asks a few questions.'") (internal citations omitted); *United States v. Robinson*, 2021 WL 2778556, at *3 (D.D.C. July 1, 2021) ("A seizure does not occur simply because police officers approach an individual."); *but see United States v. Winecoff*, 2021 WL 6196999, at *6 (D.D.C. Dec. 30, 2021) (finding show of authority where officers parked their cruiser diagonally in front of the defendant's car, blocking his ability to move).

Regardless, even assuming arguendo that a show of authority occurred, Chase did not submit. On the contrary, he did not respond and instead fled from the police and directly into the street. *California v. Hodari D*, 499 U.S. 621, 626 (1991) (finding that yelling "Stop, in the name of the law!" at a fleeing individual is not a seizure if the individual continues to flee and finding seizure to occur when the defendant was tackled by law enforcement); *United States v. Veney*, 45 F.4th 2022 (D.C. Cir. 2022) (defendant did not submit to a show of authority where he continued to walk away after order to stop); *Hagan*, 2024 WL 1340879, at *2 (same).

      *b.  Officers Had Reasonable Suspicion to Stop Chase Prior to His Unprovoked Flight*

Even before Chase broke into an unprovoked flight, officers already had reasonable suspicion that some type of criminal activity was afoot:  it was after midnight and Chase was carrying what appeared to be an open beverage in an area of the city known for drinking and nightlife; Chase was wearing a style of crossbody satchel which the officers knew from experience to be a popular means for carrying illegal firearms; and upon noticing the officers, Chase appeared nervous and had changed his direction so that he was blading the right side of his body (with the satchel) away from the officers. *See Wardlow*, 528 U.S. at 124 ("nervous, evasive behavior" may be relevant to reasonable suspicion); *United States v. Brown*, 334 F.3d 1161, 1167–68 (D.C. Cir. 2003) (well-settled that furtive movements may be grounds for reasonable suspicion); *United States v. Belin*, 868 F.3d 43, 51 (1st Cir. 2017) (change in demeanor indicating nervousness

contributed to reasonable suspicion that defendant was armed and dangerous) (citing *United States v. Arnott*, 758 F.3d 40, 15   45 (1st Cir. 2014) (nervousness relevant to reasonable suspicion that defendant was armed and dangerous)).

Officers also knew the area to be a high-crime area, particularly at night, and crime statistics for the area of Chase's arrest corroborate their reasonable belief.  *See* Govt. Ex. 11 (violent crime statistics for area around arrest). Separate and apart from Chase's behavior in a high crime area, Chase had what appeared to be an open container of an unknown beverage in his hand after midnight while walking down a public sidewalk.  D.C. Code § 25–1001 criminalizes possession of an open container of an alcoholic beverage in public.  Based on the beverage alone, Officers had reason to briefly stop Chase even before he began to move away from them.

Accordingly, based on the totality of officers' objective observations, the police had already developed reasonable suspicion that was sufficient to justify a brief investigatory *Terry* stop even prior to Chase's unprovoked flight. *United States v. Gorham*, 317 F. Supp. 3d 459, 464 (D.D.C. 2018); *see generally*, *Terry*, 392 U.S. at 9.

II.  **Chase's Unprovoked Flight Provided Officers Additional Grounds for An Investigatory Stop**

As discussed above, officers already had reasonable suspicion justifying a *Terry* stop when they first attempted to approach Chase.  However, Chase's next decision—to break into headlong, unprovoked flight away from the officers—firmly establishes that officers had reasonable suspicion to stop him.

A defendant's unprovoked flight in a high-crime area has consistently been recognized as a sufficient basis to conduct a *Terry* stop.  *See, e.g. Wardlow*, 528 U.S. at 124; *Hargraves v. D.C.*, 134 F. Supp. 3d 68, 80 (D.D.C. 2015) ("[P]olice officers are justified in making a *Terry* stop where a suspect flees from the scene without any other provocation than the presence of the police,

particularly in a high crime area.").  Chase argues that his decision to run from officers was "provoked" by the officer's conduct and "attempt to stop him without a justification."  ECF 7 at 2.  But Chase's characterization of the encounter is belied by the officers' body worn camera.  As noted above, when Chase suddenly sprinted away from the officers, they were approaching the sidewalk in a non-aggressive manner and had not given Chase any commands or otherwise indicated that he was not free to leave.  As explained recently by the Court in *United States v. Taylor*:

> "The mere presence of police officers cannot transform the flight into a provoked flight or every flight from officers, including the one at issue in *Wardlow*, would be provoked. There is no evidence in the records suggesting that the officers' behavior—either while in the car, when opening the car doors, or in approaching the sidewalk—was antagonistic, aggressive, or otherwise threatening."

743 F. Supp. 3d 168, 175 (D.D.C. 2024) (finding reasonable suspicion where defendant had a distinctive L-shaped object in his satchel, appeared evasive to officers' questioning, was "blading" the satchel away from officers, and took unprovoked flight); *see also United States v. Gorham*, 317 F. Supp. 3d 459, 463-64 (D.D.C. 2018) (defendant's "decision to sprint away from the officers" as soon as one drew close enough to talk to him was unprovoked flight).  Officer Williams also observed Chase grabbing toward his waistband as he fled, which is often indicative of illegal firearm possession.

The case cited by the defendant in an attempt to explain his flight from police, ECF No. 7 at 3, is easily distinguished.  In *Woodruff*, the Court found that the defendant's flight was provoked because he started to run *after* an officer ordered him to stop and informed him that he was being detained.  Opinion and Order, ECF No. 34, *United States v. Woodruff*, 22-cr-219 (JMC) (Mar. 24, 2023).  The Court also stressed that, unlike *Wardlow* (and unlike the present case), there were no

additional factors that made Mr. Woodruff's flight suspicious—that is, no indication that it was in a high-crime area or that officers had another basis for reasonable suspicion.

III.  **Officers Had, at Minimum, Reasonable Suspicion When Chase was First Seized, and Had Probable Cause After a Gun Fell from Chase**

Less than ten seconds into officers' pursuit of Chase, an illegal firearm fell from his person and onto the street, where it was recovered by Officer Rosa.  Roughly contemporaneously, either Officer Whitfield or Officer Williams first grabbed Chase.  The government does not dispute that Chase was "seized" as soon as either officer made physical contact with Chase, even if he slipped away.  *See Torres*, 141 S.Ct. 989, 994 (2021).  The officers do not recall, and the BWC evidence is unclear, as to whether Officers Williams or Whitfield first made physical contact with Chase shortly before or after the gun fell from Chase's person.  Regardless,, whether this initial "seizure" was before or after the gun fell does not matter because officers had reasonable suspicion to initiate an investigatory stop, and to seize Chase for that purpose, even before that.  *United States v. Tuten*, 293 F. Supp.2d 30, 32-33 (D.D.C. 2003) (officers had reasonable suspicion even before seeing gun and tackling defendant, where defendant was located in a high-crime area, made furtive gestures by turning away, and fled aggressively from police while clutching toward his waist area).

Once Officer Williams and Officer Rosa observed or heard the gun fall from Chase's person, officers had constitutional authority to seize the firearm as well as probable cause to arrest the defendant. [4]   *E.g.*, *United States v. Moore*, 75 F. Supp. 3d 444, 449 (D.D.C. 2014) (finding probable cause where officer in pursuit of fleeing defendant observed gun fall from defendant's waistband);  *United States v. Leake*, Crim. No. 19-cr-194 (KBJ), 2020 WL 3489523, at *12

---

[4] It is also worth noting that, even if the gun had *not* fallen from Chase as he fled providing ample probable cause to arrest him, he nonetheless would have been arrested as soon as officers discovered his identity.   Chase was subject to not one, but *two* extraditable Maryland fugitive warrants on July 24, 2024.

(D.D.C. June 6, 2020) (D.D.C. June 6, 2020) ("[W]here officers observed a concealed firearm under circumstances that suggested that the weapon is being carried unlawfully—*e.g.*, where the firearm falls from a suspected law breaker's waistband—that observation, too, establishes probable cause to arrest.") (citing cases).

IV.   **Officers' Search of the Satchel, and Subsequent Recovery of $11,621 and 529 Tablets of Oxycodone, Was Permissible Search Incident to Arrest**

That brings us to the second target of Chase's motion to suppress: the seized currency and Oxycodone, which were recovered from Chase's satchel after search incident to arrest.  Chase makes two cursory arguments attacking the search: first, that he was "not lawfully under arrest at the time of the search," and that "even if the police had probable cause to arrest Mr. Chase" the search was not valid because he "had no means of accessing the bag at the time it was searched." ECF No. 7 at 4.  Both are unsupported by case law and easily addressed.

First, Chase's argument that he was not "lawfully under arrest" at the time of the search is untenable.  As addressed above, once the firearm had fallen from Chase into the street, officers had probable cause to arrest him.  It is unclear what basis, if any, Chase has to challenge this arrest other than those already resolved above, and he does not articulate any in his motion.

Chase's cursory attack on the search incident to arrest of his crossbody satchel is equally baseless.  Chase's satchel was searched by Officer Whitfield as officers attempted to bring Chase under arrest for illegal firearm possession.  They observed him repeatedly reaching toward his satchel and feared he had another weapon.  Given these very real concerns for officer safety, Officer Whitfield grabbed the already-open bag and quickly examined its contents.

The motivation for Officer Whitfield's search of the satchel is squarely within the first purpose of search incident to arrest "to remove any weapons [the arrestee] might seek to use."  *See Gant*, 556 U.S. 332, 338-39.  However, the subsequent search of Chase's satchel after he had been

successfully handcuffed is no less valid.  Officer Whitfield's initial search was a cursory, temporary search intended only to address the most immediate concern—the threat that Chase could have another firearm.  The second rationale for search incident to arrest, that is, the concern of evidence preservation, unquestionably remained.

Courts have repeatedly found that unzipped or open, easily accessed compartments located on an arrestee's person at the time of arrest, such as Chase's crossbody satchel, are valid search incident to arrest as they are "within [the defendant's] immediate control." *E.g.*, *United States v. Lee*, 501 F.2d 890, 892 (D.C Cir. 1974) (upholding search of defendant's purse); *United States v. Miffin*, 2024 WL 4888978, at *8 (4th Cir. Aug. 23, 2024) (unpub.) (upholding district court's conclusion that search of crossbody bag on handcuffed defendant's person was valid search incident to arrest).  Further, because of the way Chase wore the satchel on his body, unzipped and positioned at the front of his body, his open bag is more akin to pant pockets or the front pocket of a hoodie than a less easily accessed container for a handcuffed defendant, such as a backpack worn on a defendant's back.  *Accord United States v. Johnson*, 2022 WL 2373700, at *19-20 (E.D. Va. June 30, 2022) (reasoning that a search of arrestee's crossbody bag "more closely mirror[ed] a search of clothing" such that the search of the bag was "a search incident to arrest of [defendant's] *person*").

The Supreme Court's decision in *Arizona v. Gant*, 556 U.S. 332 (2009) which Chase references in his motion, does not prohibit the search in this case.  *Gant* suppressed the fruits of a warrantless search of a vehicle after the defendant was arrested for driving on a suspended license and locked inside a patrol car. *Gant* reasoned that "[i]f there is *no possibility* that an arrestee could reach into the area that law enforcement officers seek to search," the justifications for search

incident to arrest are absent.  556 U.S. at 341 (emphasis added) (*citing Preston v. United States*, 376 U.S. 364, 367-68 (1965)).

Here, even after Chase was handcuffed, there was still a possibility that Chase could have reached into the open satchel.  The bag was already unzipped and remained on his person.  It is conceivable that Chase would have been able to reach into it and attempt to destroy or discard of the incriminating evidence contained therein.  *Cf. United States v. Salazar*, 69 F.4th 474, 478 (7th Cir. 2023) (upholding search of nearby jacket after defendant was handcuffed); *United States v. Cook*, 808 F.3d 1195, 1200 (9th Cir. 2015) (upholding search of backpack located next to defendant at arrest, even though defendant was already handcuffed, because "[w]e cannot say here that there was no reasonable possibility that [defendant] could break free and reach for a backpack next to him."); *United States v. Shakir*, 616 F.3d 315, 320-21 (3d Cir. 2010) (upholding search of gym bag dropped by defendant at arrest and conducted while police held the defendant's arms); *contrast with United States v. Giles*, 498 F. Supp. 3d 21, 27 (D.D.C. 2020) (finding that search of a closed fanny pack found in a field opposite where the defendant sat in handcuffs was not a valid search incident to arrest) *and United States v. Willis*, 316 F. Supp. 3d 437, 449 (D.D.C. 2018) (applying *Gant* to suppress the contents of a *closed* backpack located on the defendant's back, where officers did not have probable cause to arrest the defendant until after the search, and setting out factors to analyze "whether or not a *closed* backpack or bag can be searched incident to arrest") (emphasis added).  Tellingly, the Supreme Court has blessed warrantless searches incident to arrest of areas on a defendant's person, even when that search occurred after the arrestee was firmly under police custody at the time of the search, and it gave no indication in *Gant* that it was overturning decades of precedent.  *E.g.*, *Gustafson v. Florida*, 414 U.S. 260, 262, & n.2 (1973) (warrantless search of a cigarette box found in the front pocket of a coat arrestee was wearing

during a search of his person, was per se reasonable under *Robinson* even though the search of the cigarette box occurred after the arrestee had been placed "in the back seat of the squad car").

V.    **Even if Officers' Search of the Satchel was Illegal, the Fruits of that Search are Protected by Inevitable Discovery**

Finally, assuming *arguendo* the Court finds that Chase's satchel was not validly searched incident to arrest, the currency and Oxycodone should not be suppressed as the contents of the satchel would have inevitably been discovered when Officers processed Chase for transport and inventoried his property upon his processing at the Third District Station.

The Fourth Amendment's exclusionary rule usually applies to the fruits of an unconstitutional search or seizure. *Wong Sun v. United States*, 371 U.S. 471, 484 (1963). However, because of the high costs associated with excluding evidence, the Supreme Court has recognized several exceptions to the exclusionary rule, including inevitable discovery. The doctrine of inevitable discovery permits the introduction of improperly seized evidence "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Nix. v. Williams*, 467 U.S. 431, 444 (1984).

Prior to transporting an arrestee, MPD policy requires officers to conduct a "thorough field search," including removing outer clothing and removing all contents of prisoners' clothing, to include "pockets, jackets, coats, shoes, socks, or other clothing articles." Govt. Ex. 8, GO 502.01 at 6-7. Officers are further required to "inspect all property removed from the prisoner," and "handle it in accordance with GO-SPT-601.01." *Id.* at 7. In turn, GO 601.01 requires that Officers inventory *all property* and document it on the appropriate form. Govt. Ex. 9, GO 601.01 at 16. Another MPD policy, GO 702.02, contemplates the procedures for warrantless searches by MPD and speaks specifically on the issue of a search incident to arrest, setting forth that "[t]he areas

included in this search are the person being arrested and the area in their immediate control." Govt. Ex. 10, GO 702.02 at 3-4. GO 702.02 also directs that Officers carefully inspect "*all areas* where contraband may be hidden," remove outer clothing, and remove all contents from the clothing. *Id.* (emphasis added). In addition, the Supreme Court has explicitly recognized that these kinds of inventory searches protect important law enforcement interests and are valid. *See Illinois v. Lafayette*, 462 U.S. 650, 645-46 (1983) (discussing the inventory exception and that "it is entirely proper for police to remove and list or inventory property found on the person or in possession of an arrested person who is to be jailed.").

Thus, even if Officers had not searched Chase's open satchel near the time of his arrest, they would have been required to remove it prior to transport and thoroughly document its contents upon return to the Third District Station. Because that process would have inevitably uncovered the same evidence, it should not be suppressed. *See United States v. Wilbourne*, No. 22-4452, 2023 WL 7319448 (4th Cir. Nov. 7, 2023) (affirming district court's denial of motion to suppress firearm based on inevitable discovery doctrine where, after the defendant was arrested and handcuffed, police recovered and searched the defendant's backpack and found a loaded firearm, explaining that "even if the [the police department] had not searched [the defendant's] backpack at the scene of his arrest, they still would have transported [the defendant] and his personal effects to the police station; searched the bags while filling out the property reports and characterizing the items as personal property or evidence; and inevitably discovered the firearm in the backpack" during a lawful inventory search).

## CONCLUSION

For all the foregoing reasons, and any additional points and authorities which may be cited by the government at a hearing on this motion, Chase's motion to suppress should be denied.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By:     */s/ Emily Reeder-Ricchetti*
        EMILY REEDER-RICCHETTI
        Special Assistant United States Attorney
        District of Columbia
        D.C. Bar No. 252710
        601 D Street, NW
        Washington, DC 20530
        202-834-0553
        Emily.reeder-ricchetti2@usdoj.gov